**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>ESSAR STEEL MINNESOTA, LLC and ESML HOLDINGS, INC.,<br><br>    Debtors. | Chapter 11<br><br>Case No. 16-11626 (CTG)<br><br>(Jointly Administered) |
| MESABI METALLICS COMPANY LLC (f/k/a ESSAR STEEL MINNESOTA, LLC) and CHIPPEWA CAPITAL PARTNERS, LLC,<br><br>    Plaintiffs,<br><br>v.<br><br>B. RILEY FBR, INC. f/k/a B. RILEY & CO., LLC,<br><br>    Defendant. | Adv. No. 18-50833 (CTG)<br><br>**Related Docket No. 10** |

**MEMORANDUM OPINION**

Chapter 11 of the Bankruptcy Code depends on an important legal fiction. A successful chapter 11 reorganization (involving a single debtor) typically involves only one actual legal entity – the corporation chartered under state law that was the prepetition debtor. That same state-law legal entity serves as the debtor in possession during the bankruptcy and emerges at the end of the case as the reorganized debtor. Federal bankruptcy law, however, treats that entity as three different things. It is, first, the prepetition debtor before the petition date; second, the "debtor in possession" in the period between the petition date and the effective

date of the confirmed plan; and third, the reorganized debtor upon its emergence from bankruptcy following the effective date.[1] The "separateness" of each of these three (fictional) "entities" is a central feature of federal bankruptcy law.

For creditors of a corporation that files for chapter 11, the time when their claim "arises" determines which bankruptcy law "entity" is liable on that claim, and thus often turns out to be critical. Unsecured claims arising before the petition date run against the prepetition debtor. In the bankruptcy case, those are unsecured prepetition claims, and (unless entitled to statutory priority) are rarely paid in full. Claims that arise between the petition date and the effective date are typically entitled to administrative priority. But like prepetition claims, they are subject to being discharged at the end of the bankruptcy case. Claims that arise after the effective date are not "claims" in bankruptcy at all, which means they are not paid out of the bankruptcy estate. But those "claims" are not discharged in bankruptcy, either. The creditor has all of the rights non-bankruptcy law otherwise provides to assert those claims against the reorganized debtor.

There are also limits on the power of each of these entities to bind its successors. An agreement entered into by the prepetition debtor in an executory contract may be rejected by the debtor in possession or, if it contains an *ipso facto* clause, may not be enforceable at all against a debtor in possession. A promise made

---

[1] *See generally In re Montgomery Ward, LLC*, 634 F.3d 732, 737 (3d Cir. 2011); Elizabeth Warren, *A Theory of Absolute Priority*, 1991 Ann. Surv. Am. L. 9, 12 (1992) ("Three entities are involved in a successful Chapter 11 plan confirmation: the pre-bankruptcy debtor, the estate, and the post-bankruptcy business. The debtor gives way to the estate at the time of the initial filing, the estate gives way to the post-bankruptcy entity on confirmation of the plan, and the post-bankruptcy business survives the confirmation.").

by the debtor in possession, unless set forth in a plan of reorganization, will not bind the reorganized debtor. These broad principles of bankruptcy law, like most general legal principles, are subject to a variety of caveats and exceptions. But they provide an important starting point for considering the problem presented in this case.

This dispute is about the liability of the reorganized debtor on promises allegedly made before the effective date. The basic factual allegation in this adversary proceeding is that, the day before the plan became effective, the reorganized debtor (before having come into existence) and the entity that acquired it under the plan entered into an engagement with an investment bank that purported to bind both entities to pay a fee for capital that the investment bank would raise for the reorganized debtor.[2] The complaint further alleges that the investment bank is now seeking to enforce that agreement against the reorganized debtor and the new owner (which received a consensual third-party release under the plan) through an arbitration proceeding. The complaint contends that those efforts violate the discharge injunction and are barred by the terms of the plan.

The investment bank has moved to dismiss the complaint, arguing that it fails to state a claim under Rule 12(b)(6) (as made applicable in this adversary proceeding under Bankruptcy Rule 7012). The complaint, however, does state a claim for which

---

[2] Mesabi Metallics Company LLC is referred to as "Mesabi" or the "reorganized debtor." Prior to its emergence from bankruptcy, that same entity was referred to as Essar Steel Minnesota LLC and is described here as "Essar Steel." Chippewa Capital Partners, LLC was the plan sponsor that acquired the reorganized debtor under the plan. It is an affiliate of ERP Iron Ore, LLC. For simplicity, Chippewa Capital Partners, LLC and ERP Iron Ore, LLC are referred to collectively as "Chippewa." The investment bank is B. Riley FBR, Inc. (f/k/a B. Riley & Co., LLC), and is referred to as "B. Riley."

relief may be granted. If the facts as alleged in the complaint are true, then (unless some defense is available) the defendant has indeed violated the discharge injunction and the terms of the plan. The motion to dismiss will therefore be denied.

That, however, is not the end of the story. The investment bank argues that the post-emergence actions of the reorganized debtor and its owner are sufficient to bind them to the otherwise discharged obligations. That may or may not be correct. For purposes of this motion to dismiss, the key point is that these facts are not alleged in the complaint. They therefore provide no basis for dismissing the complaint at this stage of the litigation.

**Factual and Procedural Background**

Essar Steel was created to develop and operate an iron ore pellet production facility in northern Minnesota.[3] Essar Steel's parent was ESML Holdings.[4] Both entities filed chapter 11 petitions on July 8, 2016.[5]

In February 2017, Chippewa, which ultimately acquired the reorganized debtor under the terms of the confirmed plan, engaged B. Riley as its financial advisor to advise it in connection with its proposed acquisition of the debtors.[6] Under the terms of the engagement agreement, Chippewa committed to pay B. Riley certain

---

[3] Complaint ¶ 10. The Complaint in this adversary proceeding is filed at D.I. 1 and is referred to as the "Complaint." The factual background set forth herein is based on the allegations contained in the Complaint, which are taken as true for the purposes of a Rule 12(b)(6) motion to dismiss. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009).

[4] Complaint ¶ 11. Essar Steel Minnesota LLC, the entity that upon its emergence became known as Mesabi is referred to (when describing its pre-emergence activities) as "Essar Steel." Essar Steel and ESML Holdings are collectively referred to as the "debtors."

[5] Complaint ¶ 11.

[6] *Id.* ¶ 43. *See generally* D.I. 1-1.

fees, including a "Success Fee," if Chippewa successfully closed "any transactions or series or combination of transactions that culminate[d] in [Chippewa] acquiring substantially all of the business assets of [the debtors]."[7] The engagement agreement was thereafter amended to provide that B. Riley would be entitled to a "Success Fee" in connection with transactions that raised capital for the reorganized debtor.[8]

In April 2017, following an auction, Chippewa was selected as the successful bidder to acquire the reorganized debtor under the terms of the proposed plan of reorganization.[9] Chippewa thereafter worked closely with the debtors and other interested parties to negotiate the plan terms.[10]

B. Riley, however, was retained only by Chippewa, not by Essar Steel. B. Riley accordingly did not serve as financial advisor to the debtor in possession. "[A]n application to employ [B. Riley] was never filed in the Chapter 11 Cases, and accordingly, the Court did not approve for [B. Riley] to be employed by the Debtors or paid from the Debtors' estates."[11]

The debtors' filed their third amended chapter 11 plan of reorganization on June 8, 2017.[12] B. Riley is alleged to have had notice of the plan; indeed, the complaint states that B. Riley filed a declaration in support of confirmation.[13]

---

[7] Complaint ¶ 44.

[8] *Id.* ¶ 45.

[9] *Id.* ¶ 24.

[10] *Id.* ¶ 25.

[11] *Id.* ¶ 16.

[12] *Id.* ¶ 26.

[13] *Id.* ¶¶ 28, 69.

...
The plan set out a procedure by which those who hold administrative claims against the bankruptcy estate could file such claims – which are claims that must have been incurred "on or after the Petition Date and before the Effective Date"[14] – and set a deadline by which those claims must be filed.

Otherwise, the plan provides that claims against the debtors (whether prepetition or administrative) are both released by creditors and discharged.[15] In addition, under the terms of the plan, creditors who did not elect to opt out released not only their claims against the debtors (which were subject to the discharge in any event) but also consented to the release of any claims they might hold against Chippewa.[16] The plan and confirmation order each contain injunctions that operate to enjoin creditors from taking action to assert any claim that is released.[17]

The Court confirmed the debtors' third amended plan on June 13, 2017.[18] Thereafter, the debtors sent parties in interest a notice, informing them of the deadlines for filing claims as set forth in the plan.

The confirmed plan was set to become effective on December 22, 2017. It is alleged, however, that on the eve of the effective date the parties amended the B. Riley engagement agreement to provide that Mesabi, the reorganized debtor, would become bound (along with Chippewa) to pay the success fee for capital raised for the

---

[14] *Id.* ¶ 35.

[15] *Id.* ¶¶ 38-39.

[16] *Id.* ¶ 38.

[17] *Id.* ¶¶ 40-41.

[18] *Id.* ¶ 29.

reorganized debtor.[19] The Complaint further alleges that B. Riley, despite being on notice of the administrative claim bar date, never filed a proof of claim or administrative claim in the bankruptcy cases by the February 5, 2018 bar date.[20]

The reorganized debtor closed on a $650 million construction financing loan in June 2018. B. Riley asserts that, under the terms of the parties' agreements, it is entitled to a success fee (after crediting amounts already paid pursuant to the agreement) of almost $17 million for the construction financing loan.[21]

Mesabi and Chippewa refused to pay the fee. In July 2018, B. Riley filed a statement of claim with the Financial Industry Regulatory Authority ("FINRA") against Mesabi and Chippewa seeking to recover on this claim.[22] After filing the FINRA statement of claim, B. Riley filed a separate complaint against Mesabi and Chippewa, in the United States District Court for the District of Minnesota, asking the court to enter a temporary restraining order (and subsequently a preliminary injunction) pending the outcome of the FINRA arbitration.[23]

On September 24, 2018, Mesabi and Chippewa filed this adversary proceeding against B. Riley for civil contempt, breach of contract, and a declaratory judgment

---

[19] *Id.* ¶ 47.

[20] *Id.* ¶ 37.

[21] *Id.* ¶ 33.

[22] *Id.* ¶¶ 58-59; *see* D.I. 1-4 at 51.

[23] Complaint ¶¶ 61-62; *see* D.I. 1-4.

that the FINRA arbitration and the Minnesota lawsuit violate the debtors' plan, this Court's confirmation order, and the Bankruptcy Code.[24]

In October 2018, B. Riley moved to dismiss the complaint.[25] In February 2019, the Court granted B. Riley's motion to dismiss for want of subject-matter jurisdiction.[26] The district court certified a direct appeal to the Third Circuit, which held that this case did fall within the bankruptcy jurisdiction and remanded the case back to this Court.[27]

On remand, B. Riley moved the Court to abstain under 28 U.S.C. § 1334(c)(1), which permits a bankruptcy court to abstain from hearing a dispute "in the interest of justice, or in the interest of comity with State courts or respect for State law."[28] The Court denied that motion, explaining in its bench ruling that because the issues presented are ones of bankruptcy law and the effect of the plan of reorganization that this Court confirmed, it made more sense for this Court to engage those questions than to require the FINRA arbitral panel to resolve them.[29] The parties agreed that the Court should take up the motion to dismiss the complaint on the merits that had

---

[24] Complaint ¶¶ 65-85.

[25] *See* D.I. 9.

[26] D.I. 28 ("This order memorializes and implements the Court's oral decision of February 12, 2019…finding that the Adversary Proceeding does not present a sufficiently close nexus to the implementation of the chapter 11 plan of reorganization…to support the Court's exercise of jurisdiction to consider and dispose of the parties' respective claims and defenses.").

[27] *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 196, 199 (3d Cir. 2022) (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

[28] D.I. 50.

[29] D.I. 82; *see* Feb. 1, 2023 Hr'g Tr. at 19-20.

<021/>

that the FINRA arbitration and the Minnesota lawsuit violate the debtors' plan, this Court's confirmation order, and the Bankruptcy Code.[24]

In October 2018, B. Riley moved to dismiss the complaint.[25] In February 2019, the Court granted B. Riley's motion to dismiss for want of subject-matter jurisdiction.[26] The district court certified a direct appeal to the Third Circuit, which held that this case did fall within the bankruptcy jurisdiction and remanded the case back to this Court.[27]

On remand, B. Riley moved the Court to abstain under 28 U.S.C. § 1334(c)(1), which permits a bankruptcy court to abstain from hearing a dispute "in the interest of justice, or in the interest of comity with State courts or respect for State law."[28] The Court denied that motion, explaining in its bench ruling that because the issues presented are ones of bankruptcy law and the effect of the plan of reorganization that this Court confirmed, it made more sense for this Court to engage those questions than to require the FINRA arbitral panel to resolve them.[29] The parties agreed that the Court should take up the motion to dismiss the complaint on the merits that had

---

[24] Complaint ¶¶ 65-85.

[25] *See* D.I. 9.

[26] D.I. 28 ("This order memorializes and implements the Court's oral decision of February 12, 2019…finding that the Adversary Proceeding does not present a sufficiently close nexus to the implementation of the chapter 11 plan of reorganization…to support the Court's exercise of jurisdiction to consider and dispose of the parties' respective claims and defenses.").

[27] *In re Essar Steel Minnesota, LLC*, 47 F.4th 193, 196, 199 (3d Cir. 2022) (citing *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009)).

[28] D.I. 50.

[29] D.I. 82; *see* Feb. 1, 2023 Hr'g Tr. at 19-20.

been filed in this Court back in October 2018. The Court heard argument on that motion in May 2023.

## Jurisdiction

As the Third Circuit previously held, this Court has "arising in" subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b).[30] This is a core matter that has been referred to this Court by the district court under 28 U.S.C. § 157(a) and the district court's standing order of reference.[31]

## Analysis

A court's task on a Rule 12(b)(6) motion is to determine whether the complaint "states a legally sufficient claim based on the plain statement of facts alleged."[32] Under *Twombly*, the nonconclusory allegations of fact need to assert a plausible claim.[33] The Third Circuit set out a three-step process for courts' review of plausibility.[34] *First*, identify the elements of the claims alleged.[35] *Second*, ensure that the complaint consists of well-pleaded facts.[36] And *third*, if the facts are well-pled, determine "whether they plausibly give rise to an entitlement for relief."[37]

---

[30] *See Essar Steel Minn.*, 47 F.4th at 199. *See also Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *In re Allegheny Health Educ. & Research Found.*, 383 F.3d 169, 174-176 (3d Cir. 2004).

[31] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[32] *In re Reitz*, 134 B.R. 131, 132 (Bankr. D. Del. 1991).

[33] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation omitted).

[34] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

[35] *Id.*

[36] *Id.*

[37] *Id.*

While the complaint asserts three counts – a claim for civil contempt for violating the confirmation order and discharge injunction; a claim for a declaratory relief to the same effect; and a claim for breach of contract (on the theory that the plan of reorganization is itself a contact) – the elements of these claims are essentially the same: that the debt at issue was discharged and/or released under the plan and confirmation order and that the defendant took action to collect on the discharged debt. The facts alleged are described above. Whether those facts give rise to a plausible claim thus turns on whether the debt in question is subject to the discharge and plan release.

**I.   The complaint adequately alleges that B. Riley's claim arose prior to the effective date of the debtors' plan, such that the efforts to enforce it would violate the discharge injunction and the terms of the plan.**

The central question presented by this motion to dismiss is when B. Riley's claim against Mesabi arose. Claims that arise before the effective date of a plan are subject to the discharge. Claims that arise afterwards are not discharged. B. Riley thus argues that its claim against the reorganized debtor did not arise when the contract was entered into, but only after the effective date.

The complaint alleges that the final amendment to the engagement agreement, under which Mesabi purportedly became a party to it, is dated December 21, 2017. The plan became effective the next day. If the claim against Mesabi arose on December 21, it was discharged by the plan. If it arose after the effective date, it is not affected by the bankruptcy discharge.

B. Riley's basic argument is that even though the engagement letter was signed before the plan's effective date, the document states that the agreement is to

10

become effective *after* the plan's effective date. In B. Riley's view, the actions taken by Chippewa that purport to bind Mesabi to the engagement letter are sufficient to create an obligation that binds Mesabi, as of the effective date. This theory is premised on the state-law principle that would permit, outside of bankruptcy, a promoter of a company to bind a not-yet-extant company to obligations before its formation.

This argument, however, fails for two reasons. *First*, even on its own terms, the state-law principle on which B. Riley relies requires the corporation, after it has been formed, to adopt, ratify, or novate the agreement in order to be bound by it. "Since the corporation cannot become liable before it comes into existence, its mere incorporation will not of itself charge it with liability for contracts promoters had purported to make in its behalf."[38] Rather, the corporation is not bound unless it, "either by formal action or without formal action if the contract requires no formality, become[s] bound as a party to a new contract of the same terms by adoption or more accurately, novation."[39]

*Second*, and perhaps more fundamentally, even if state law did permit a promoter to bind a corporation to an obligation before it were formed, enforcing that principle to impose liability on a reorganized debtor would be inconsistent with basic bankruptcy principles. The notion, after all, is that in the paradigmatic reorganization case, creditors of the debtor would receive shares in the reorganized

---

[38] *Williston on Contracts* § 35:71.

[39] *Id.* (footnote omitted).

debtor in satisfaction of their prepetition claims. The entire scheme of permitting those creditors to vote based on a court-approved disclosure statement, describing the plan of reorganization, is premised on the principle that creditors are entitled to understand what the assets and liabilities of the reorganized debtor will be upon emergence in order to decide whether to accept the plan.[40] To be sure, once the reorganized debtor emerges, creditors are generally left to state-law remedies regarding the actual governance of the reorganized debtor. But prior to the point of emergence, the Bankruptcy Code itself (and the discharge of liabilities incurred before the effective date) operates to ensure that the debtor does not emerge with secret obligations that were not disclosed to creditors in the plan process.[41]

This understanding is also consistent with Third Circuit precedent on when a claim in bankruptcy arises. "Claim" is defined broadly under § 101(5) of the Bankruptcy Code as any "right to payment." Because only "claims" are entitled to

---

[40] *See generally* 1 *Collier on Bankruptcy* ¶ 1.07[iv] ("The disclosure statement is required by section 1125 and once approved by the court must be transmitted with the plan when votes are being solicited … The disclosure statement is expected to contain adequate information to enable a reasonable investor to make an informed judgment on the plan."); 7 *Collier on Bankruptcy* ¶ 1125.01; *see In re Phoenix Petroleum Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[I]t is understood that the general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan.") (citing *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988)); *see also In re GAC Storage Lansing, LLC*, 485 B.R. 174, 194 (Bankr. N.D. Ill. 2013) (holding that the debtor's plan was inadequate due to its failure to disclose the reorganized debtor's management structure to creditors).

[41] *Ellis v. Westinghouse Elec. Co., LLC*, 11 F.4th 221, 227 (3d Cir. 2021) ("Although plans usually become effective shortly after confirmation, there can be a delay of months or longer"); *id.* at 234 ("Where the gap between the confirmation and effective date is significant, concerns about undisclosed liabilities are heightened.").

payment in the bankruptcy case and are subject to being discharged, the question whether a party holds a "claim" is of substantial importance.

The leading Third Circuit case on the meaning of the term "claim" is *In re Grossman's*.[42] It holds, in the context of a product liability tort claim, that the claim arises "when an individual is exposed prepetition to a product or other conduct giving rise to an injury."[43] That holding, by itself, may not go terribly far in addressing when a contract-based claim arises. The importance of *Grossman's* for present purposes, however, is that it expressly overruled the court's prior precedent in *Frenville*.[44] The *Frenville* case involved a debtor that, before the bankruptcy case, had agreed to indemnify its accounting firm for any claim that might be asserted against it related to its preparation of the debtor's financial statements. The accounting firm was sued on such a claim after the debtor's bankruptcy filing. The Third Circuit held that relief from the stay was not required for the accounting firm to implead the debtor, because the accounting firm's claim against the debtor arose after the bankruptcy filing and thus did not implicate the automatic stay.

The court's rationale was that a claim arose when it "accrued" under non-bankruptcy law. Because the accounting firm could not sue for indemnity unless and until a claim had been asserted against it, it did not have a "claim" against the debtor until it was sued.[45] If *Frenville* were still good law, B. Riley would have a strong

---

[42] 607 F.3d 114 (3d Cir. 2010) (*en banc*).

[43] *Id.* at 125.

[44] *In re M. Frenville Co.,* 744 F.2d 332 (3d Cir. 1984).

[45] *Id.* at 336.

13

argument that its right to a success fee arose after the bankruptcy. Unless and until it raised the capital, B. Riley would not have a legally enforceable right to assert a claim against Mesabi for the success fee. So under *Frenville*'s "accrual" test, B. Riley would have a strong argument that its claim against Mesabi arose after the effective date of the plan, and therefore was not discharged.

The significance of *Grossman's*, however, is its decision to overrule *Frenville* and reject the accrual test. *Grossman's* explained that the accrual test conflicted with "the Bankruptcy Code's expansive treatment of the term 'claim,'" which was intended to include "all legal obligations of the debtor, no matter how remote or contingent."[46]

Because *Grossman's* involved a product liability tort claim, the Third Circuit went on to engage the question when a claim arises in that context. As the court explained, in the tort context, the question of when the claim arises for bankruptcy law purposes raises important due process concerns. If the claim arises whenever the defendant's conduct giving rise to tort liability took place, there is at least the possibility that the claim may be discharged in bankruptcy before the creditor would have had any reason to know that it had a claim that it needed to assert in the debtor's bankruptcy case. In view of that concern, the court held that a claim "arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code."[47]

---

[46] 607 F.3d at 121.

[47] *Id.* at 125.

14

Those due process concerns, however, are absent when the source of a claim is a contract. A party who becomes a creditor as a result of having been exposed (perhaps unknowingly) to a debtor's asbestos-containing products and inhaling microscopic asbestos fibers into the creditor's lungs (which may not manifest into a disease for several decades) cannot reasonably be expected to assert its rights in the debtor's bankruptcy case. But a party that enters into a contractual arrangement with the debtor, either prepetition or in the period between the petition date and the effective date, is on fair notice of the existence of its claim – even if the claim is contingent and unmatured – during the bankruptcy case. Accordingly, now that the Third Circuit has abandoned *Frenville*'s accrual test, the logical implication is that a contract-based claim arises at the time the parties enter into the contractual agreement.

Here, B. Riley entered into an agreement with Mesabi before the effective date of the debtors' plan of reorganization. Any "claim" that B. Riley has to enforce that contract (subject to the points made in Part III, below) would have been a claim in the Essar Steel bankruptcy case and was thus discharged upon the effective date of the plan.[48] As set forth above, the debtors provided notice of the administrative claims bar date upon the effective date of the plan. B. Riley did not assert an administrative claim by that bar date. For present purposes, however, the central

---

[48] *See Westinghouse, LLC*, 11 F.4th at 234 (explaining that a claim arising between confirmation and the effective date is an administrative claim, since, under the Bankruptcy Code, the "only temporal limit is with the existence of the estate, not the date of confirmation") (citing 11 U.S.C. § 503(b)(1)(A)).

15

point is that B. Riley is incorrect to argue that the complaint fails to state a claim for violation of the discharge injunction and the terms of the plan. The motion to dismiss will therefore be denied with respect to Mesabi.

## II. The complaint adequately alleges that B. Riley's claim against Chippewa is barred by the plan injunction.

Essentially the same analysis applies to the claim as it relates to B. Riley's efforts to recover the success fee from Chippewa, which also (like Mesabi) became a party to the engagement agreement immediately prior to the effective date.[49] While, as a non-debtor, Chippewa is not protected by the Bankruptcy Code's discharge injunction, there is no dispute that § 14.22 of the debtors' plan and paragraph 56 of this Court's confirmation order bar the assertion of any "claim" against Chippewa.

B. Riley responds to that assertion by noting that because it did not hold a prepetition claim, it was not solicited to approve or reject the plan and was therefore not given the opportunity to opt out of the plan's third-party release provision. Receiving such an opt-out form, however, is not a condition to one being bound by the terms of a confirmed plan. The Supreme Court has explained that a confirmation order is fundamentally the same as any other judgment.[50] Once a judgment becomes final and non-appealable, it is binding on all parties thereto that received

---

[49] As noted above, *see* n.2, this Memorandum Opinion, in the interest of simplicity, has referred to both Chippewa Capital Partners, LLC and its affiliate ERP Iron Ore, LLC as "Chippewa." In the interest of precision, however, it should be noted that the complaint alleges that ERP Iron Ore, LLC was an original signatory of the engagement agreement. It is only Chippewa Capital Partners, LLC that is alleged to have joined as a party on the eve of the plan's effective date.

[50] *See generally Travelers v. Bailey*, 557 U.S. 146, 150 (2009).

16

constitutionally adequate notice thereof. In *Travelers v. Bailey*, the Court barely paused over the proposition that the third-party injunction, entered in connection with the Johns Manville plan of reorganization, was broader than it ought to have been in that it extended to liability that was not derivative of Manville's liability. "They may well be right about that," the Court observed.[51] "But be that as it may, where the plain terms of a court order unambiguously apply, as they do here, they are entitled to their effect."[52]

This Court made a similar point in *In re Arsenal Intermediate Holdings, LLC*.[53] A third-party release contained in a plan of reorganization is a provision that, based on the facts and circumstances of the case, may or may not be authorized. A party that may be bound by a provision that it believes is unauthorized may object to the plan. Giving creditors the ability to "opt out" by submitting a form, rather than requiring them to file plan objections, is a good and sensible practice. But the enforceability of the plan in accordance with its terms does not depend on whether a particular creditor was or was not given the ability to opt out of the release by returning the form. Once the confirmation order becomes final and non-appealable,

---

[51] *Id.* at 150.

[52] *Id. See also United States Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 275 (2010) (although the plan contained "legal error," the order confirming it "remains enforceable and binding on [the creditor] because [the creditor] had notice of the error and failed to object or timely appeal").

[53] No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023).

17

it is enforceable against all parties that received constitutionally adequate notice thereof.[54]

For these reasons, the plan does adequately allege that the actions by B. Riley to collect the success fee violate the terms of the plan and confirmation order. The motion to dismiss will thus be denied with respect to Chippewa.

### III. B. Riley's remaining arguments do not provide a basis to dismiss the complaint.

In moving to dismiss, B. Riley also argues that actions taken by Mesabi after the effective date operate to ratify or novate the obligation, such that the debt can fairly be enforced against Mesabi after the effective date. B. Riley argues that "Mesabi adopted the Engagement Agreement" by virtue of B. Riley's involvement in negotiations after the effective date.[55] B. Riley also seeks to show that it provided post-effective date service to Mesabi, which Mesabi accepted, and thus became obligated to pay for.[56]

All of that may or may not be correct. But none of it is properly before the Court on a motion to dismiss. As described above, the question on a motion to dismiss is simply whether the factual allegations of the complaint, if taken as true, state a plausible claim for relief.

To the extent it is true that Mesabi and/or Chippewa took action after the effective date of the plan that would be sufficient to obligate them to pay the success

---

[54] *Id.* at *8.

[55] D.I. 10 at 7.

[56] *Id.*

fee, none of that is pled in the complaint, and those facts accordingly are not properly before the Court on a motion to dismiss. Indeed, it seems likely (though the Court need not and does not decide the matter today) that a reorganized debtor's adoption or novation of an otherwise discharged debt would be an affirmative defense to a claim of violation of the discharge, such that it would be the creditor's burden to plead and prove those facts. For present purposes, the only thing the Court needs to decide is that none of these facts is alleged in the complaint and that they therefore provide no basis on which to dismiss the complaint.

* * *

The Court appreciates, as the Third Circuit observed, that the strict enforcement of the "effective date" as the line that separates the liabilities of the bankruptcy estate from those of the reorganized debtor (like the strict enforcement of the petition date as the line that separates prepetition claims against the debtor from administrative claims against the bankruptcy estate) can yield a "harsh result."[57] But that harshness (and its apparent invitation to conduct that may appear unscrupulous) is simply the nature of a legal rule under which the passage of a point in time alters parties' rights, much like any other legal deadline. As the Third Circuit put it in *Westinghouse,* "[d]ates matter in bankruptcy."[58] That means that parties doing business with a debtor in possession after the plan is confirmed, but before the plan's effective date, need to take particular care if they expect those agreements to

---

[57] *Westinghouse*, 11 F.4th at 233.

[58] *Id.* at 226.

19

be enforceable against the reorganized debtor. This case does not require the Court to decide whether, as a strict matter of law, the reorganized debtor's liabilities are necessarily limited to those set forth in the plan, or whether in the period after confirmation a court may approve an agreement (on notice to creditors) that – like a plan amendment – would bind the reorganized debtor. It is sufficient for today's purpose to hold that, based on the allegations of the complaint, any undertaking that purported to bind the reorganized debtor prior to the effective date cannot, as a matter of law, do so.

## Conclusion

For the foregoing reasons, the motion to dismiss the complaint will be denied. The Court will enter a separate order denying the motion.

Dated: June 23, 2023

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE